1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF HAWAII

3
    UNITED STATES OF AMERICA,      ) CRIMINAL NO. 19-00148JMS
4                                   )
              Plaintiff,            ) Honolulu, Hawaii
5                                   ) April 14, 2022
          vs.                       )
6                                   )
    CATHERINE NICOLE ZAPATA,        ) SENTENCING AS TO COUNT 1 OF
7                                   )  THE FELONY INFORMATION
              Defendant.            )
8   _____ )

9
                    TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
              CHIEF UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12
    For the Government:       MICHAEL NAMMAR, ESQ.
13                            Office of the United States Attorney
                              PJKK Federal Building
14                            300 Ala Moana Blvd., Room 6100
                              Honolulu, Hawaii   96850
15

16  For the Defendant:        THOMAS M. OTAKE, ESQ.
                              Thomas M. Otake AAL, ALC
17                            841 Bishop Street, Suite 2201
                              Honolulu, Hawaii   96813
18

19

20  Official Court           Cynthia Fazio, RMR, CRR, CRC
    Reporter:                United States District Court
21                           300 Ala Moana Blvd., C-270
                             Honolulu, Hawaii  96850
22

23

24
    Proceedings recorded by machine shorthand, transcript produced
25  with computer-aided transcription (CAT).

1   THURSDAY, APRIL 14, 2022                          3:00 P.M.

2          THE COURTROOM MANAGER:  Criminal Number 19-00148JMS,

3   United States of America versus Catherine Nicole Zapata.

4          This case has been called for sentencing as to Count 1

5   of the information and a hearing on government's sealed motion.

6          Counsel, please make your appearance for the record.

7          MR. NAMMAR:  Good afternoon, Your Honor.  Michael

8   Nammar for the United States and for the record Mr. Jo from the

9   United States Probation.

10          THE COURT:  All right.  Yes, thank you.

11          MR. OTAKE:  Good afternoon, Your Honor.  Thomas Otake

12   on behalf of Catherine Nicole Zapata, who is present.

13          THE COURT:  All right.  So thank you.  Good afternoon

14   to both of you.

15          Let me start with you, Mr. Otake and Ms. Zapata, and

16   ask both of you if you've had a full opportunity to read,

17   review and discuss the presentence report and to file any

18   objections, whether factual or legal, in writing?

19          MR. OTAKE:  Yes, Your Honor.

20          THE COURT:  Is that right, ma'am?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Okay.  Thank you.  You can be seated.  All

23   right.

24          So, the defendant pled guilty, I believe this was an

25   information, a single-count information.  There's -- we have a

3

1    (c)(1)(A) agreement.  I am satisfied the agreement adequately

2    reflects the seriousness of the actual offense behavior and

3    accepting it will not undermine the statutory purposes of

4    sentencing.  In other words, I accept the plea agreement.

5              I do want the record to reflect I've read the various

6    letters, including the one defendant submitted to me.  I

7    understand it.  Neither side has any objections to either the

8    factual findings or conclusions as to guidelines; is that

9    accurate?

10             MR. NAMMAR:  Yes, Your Honor.

11             MR. OTAKE:  Yes, Your Honor.

12             THE COURT:  All right.  So based on that and my own

13   independent review, I do adopt the factual findings in the

14   report as my own as well as the conclusions as to the

15   guidelines.

16             We have a total offense level 23, criminal history

17   category one.  Advisory range of 46 to 57 months.  Supervised

18   release of three years.  Fine, 20,000 to 1 million, and a $100

19   special assessment.  Do both counsel concur with that?

20             MR. NAMMAR:  Yes, Your Honor.

21             MR. OTAKE:  Yes, Your Honor.

22             THE COURT:  All right.  And I have read the

23   Government's Motion for Downward Departure.  There is no

24   mandatory minimum, right?  That's correct?

25             MR. NAMMAR:  That's correct.

1           THE COURT:  Okay.  I have read the Government's 5K

2    motion, will grant that motion.  I don't need to hear argument

3    on it.  And that way either of you can incorporate that into

4    your statements to me as you see fit without having to, you

5    know, argue specifically to grant the motion.

6           All right.  So I think that's all of the -- and did

7    both of you get the Kapilipono report?

8           MR. NAMMAR:  Yes, Your Honor.

9           MR. OTAKE:  We did and we reviewed it.  Thank you.

10          THE COURT:  Okay.  So with that then I'll turn to you,

11   Mr. Otake.

12          MR. OTAKE:  Thank you, Your Honor.  As we all know

13   you're tasked today with crafting, as the law puts it, a

14   sentence that's sufficient but not greater than necessary when

15   considering all of the sentencing factors.  And our position is

16   when you do that analysis it comes to the conclusion that

17   prison time or incarceration is not necessary in this case and

18   would be greater than what is required under the various

19   sentencing factors.

20          You know, when you look at the different factors,

21   starting first with the nature and circumstance of the offense,

22   I won't spend too much time on that.  The presentence report

23   summarizes well what happened here.  I will, of course,

24   highlight that she was found to be a minor participant, at

25   least that was what was recommended by the probation office and

1    the government didn't object to that and the Court adopted that

2    today.  And, you know, that was because, not making any

3    excuses, she made her own decisions and it was her bad

4    decisions that led to this.  But the context of it was at the

5    time she was in a relationship with Mr. Taboada, who was a drug

6    dealer.  And he involved her in it and she should have been

7    strong enough to say no and she knows better than that, and

8    that's on her.  But that's the circumstances that led to that.

9           You know, part of what was so great about the

10   Kapilipono program is it helped her to understand why she

11   wasn't strong enough to stand up and do the right thing.  The

12   presentence report talks a lot about some of her past

13   relationships and the domestic violence she experienced through

14   her life.  And, you know, I would -- I don't think it's a

15   stretch to say that it's pretty extreme domestic violence she

16   experienced in the past.  And, you know, Mr. Taboada, you'll

17   hear, was actually -- treated her well, wasn't violent at her

18   and I think that all participated in her bad decisions, which

19   she owns up to.  But the Kapilipono program helped her look

20   into that and learn from that and become much stronger and more

21   independent into the future.

22          As far as the history and characteristics of --

23   everyone calls her Nicky -- of Nicky, they really bode well in

24   her favor.  She has a strong employment history, a great career

25   going at Kaneohe VCA.  She loves her work there.  It's so nice

1     to see someone who is in a profession that they love.  And

2     she's passionate about it.  She loves animals, she loves

3     working with the dogs and whatnot out there.  And that's

4     another thing the program helped her with.  It helped her

5     advance.  She was fine, she was happy in her position, but they

6     encouraged her and pushed her.  So she advanced.  She was able

7     to do more things.  She's now enrolled in school, as you know,

8     getting the education she needs to become a certified vet tech

9     which will serve her well.  And the people at VCA Kaneohe love

10    her.  And so she has that going for her.  And she's really

11    enjoying school and learning a lot there.

12          You know, then she has a very strong and supportive

13    family.  A lot of them are here today.

14          THE COURT:  What are the makeup of the work hours,

15    school hours, how is that -- maybe she has to answer that, I'm

16    not sure.

17          MR. OTAKE:  In terms of how often is your -- it's an

18    online school, so she works full-time.

19          THE COURT:  How many hours a week, I guess, is on

20    school?

21          THE DEFENDANT:  It depends.  It's work on your own

22    pace.  So it's whenever I have the time to do it.  I try to get

23    to it as often as I can when I have the free time after work.

24          THE COURT:  Okay.  All right.  Thank you.

25          MR. OTAKE:  But she is working there full-time and she

1    does the online schooling in the -- when she is free.

2         She has a strong family and lot of support.  Her mom,

3    her grandma, her sister and her new boyfriend who has been a

4    great source of support to her and much healthier relationship.

5    And they're all here today.  They've been involved from the

6    very beginning.  I remember, you know, when this first started

7    her mom coming to see me and I met with her countless times

8    since then.  And, you know, I would say you won't find a more

9    supportive family and they've been with her all the way.

10        And, you know, I mentioned it earlier, her history

11   with domestic violence.  She's overcome a lot of that and she's

12   really heading in the right direction.

13        And then you look at how she performed on pretrial

14   release and in the Kapilipono program.  It was heartwarming to

15   read the report.  You know, in the beginning it was actually

16   the first time I actually learned about this program.  And, you

17   know, it was very interesting to me.  I was happy the Court was

18   trying it out and established it.  And I thought that Nicky

19   would be a great fit for it.  We worked together on coming up

20   with her goals and it's great to see that she accomplished all

21   of those goals.  And, you know, it was a great program for her,

22   built a lot of confidence.  You know, it was a great concept.

23   Regular status reviews with Judge Trader, and Ms. Alison Thom

24   was constantly involved and would call me from time to time.

25   It was just a great experience for her and it really put her on

1    a path for a really bright and good future.

2         And then lastly, there is the cooperation, which was

3    significant.  And she did what she could.  Given that she was a

4    minor participant, she did whatever she could.  And that, of

5    course, also bodes well in her favor.

6         As far as the big picture goes, Your Honor, we're here

7    almost four years after she was arrested and part of that was

8    because of COVID and part of that was because of the

9    opportunity that this Court and the U.S. attorneys gave her to

10   participate in a program.  But we have, you know, almost four

11   years of history of her really doing well, improving, she's

12   employed, she's going to school and she's heading down the

13   right path and it just would be so counterproductive to have

14   her go and do prison time now.  It wouldn't serve the

15   community's interest.  It would be -- would actually be a

16   tremendous step backwards.  She would obviously lose her job.

17   And when you look at all the sentencing factors, it just

18   doesn't seem like it's necessary in this case.

19        And so, you know, I know in our memorandum that we

20   submitted we said a sentence that avoids incarceration.  I

21   guess there's two ways to do that, I guess.  One would be

22   probation.  She did -- she was arrested and spent, you know,

23   maybe 30 hours in custody at FDC.  So I guess conceivably you

24   could give her credit for time served with supervised release.

25   And, you know, honestly, whatever the Court is more comfortable

1    with, if the Court is willing to go along with no additional

2    prison time would, you know, of course be a gift either way.

3            So, that's why we're asking for what we're asking for.

4            THE COURT:  All right.  Thank you, Mr. Otake.

5            Ms. Zapata, this is your opportunity to address me,

6    ma'am.  If you -- let me back up.

7            This is your opportunity to address me.  If you don't

8    want to, I don't hold that against you.  I just wanted to let

9    you know that.  If you do want to, just make sure you keep that

10   microphone about where it is is fine.

11           MR. OTAKE:  And she wrote something out she'd like to

12   read to you, Your Honor.

13           THE COURT:  Okay.  All right.

14           THE DEFENDANT:  I want to begin by thanking the Court

15   for the opportunity to participate in the Kapilipono program.

16   Being in the program has taught me so much and helped me in

17   many ways.  I want you to know that I really appreciate the

18   opportunity to be in the program.

19           I want you to know that I accept full responsibility

20   for my actions in this case.  I made terrible decisions that I

21   am ashamed of.  I knew better and I was raised better.

22   Participating in this program helped me to understand why I

23   made the bad decisions that I made.  Although my ex-boyfriend

24   at the time got me involved, I should have been strong enough

25   to say no.  I understand now that my substance abuse issues and

1   my past relationship issues played a big part in my bad
2   decision-making.
3        Over the last year I've worked to be more confident in
4   myself and worked to advance in my career so that I can be
5   strong, independent -- so that I can be a strong, independent
6   individual.  I ask for the chance to continue down this good
7   path.  I love my career and I am enjoying school.
8        I want to thank my family here today, my mom, my
9   grandma, my sister and my boyfriend.  I would not be here
10  without their support.  I also want to thank Alison Thom and
11  the staff of the Kapilipono program and Judge Trader for
12  believing in me and pushing me to be better and caring about me
13  and my future.
14       Lastly, I want to apologize to the community for my
15  involvement in this case.  I understand how devastating drugs
16  are on families here in Hawaii and I am ashamed that I was
17  involved in any activities that had such a bad effect on the
18  community.
19       THE COURT:  All right.  Thank you, ma'am.
20       THE DEFENDANT:  Thank you, Your Honor.
21       MR. NAMMAR:  Your Honor, I agree with a lot, with a
22  lot of what Mr. Otake said.  I think where we differ is how far
23  to vary downwards.
24       THE COURT:  And let me tell you, I look at sort of
25  three factors on this --

1             MR. NAMMAR:  Right.

2             THE COURT:  -- downward, right?  Like where would I be

3    without cooperation, without Kapilipono, just on the facts.

4    And I think something below the guideline range is where -- I

5    mean just -- I mean it may not be what you recommend.

6             MR. NAMMAR:  Right.

7             THE COURT:  But, you know, I mean when you look at her

8    role in the offense, when you look at the history, clearly the

9    boyfriend was the moving force here.

10            MR. NAMMAR:  Right.

11            THE COURT:  Right?  And it's not to say, I don't want

12   to make it sound as if she didn't have free will.  I mean, and

13   she hasn't argued that, nor has the defense.  But going from an

14   abusive relationship, so that relationship and then him sort of

15   pushing her in this direction, right?  That's what we can all

16   see.

17            So I think I'd start below, then you'd have the 5K,

18   then you'd have the Kapilipono, right?  So that's how I'm

19   looking at it.  Now, where that -- I want to hear from

20   everybody as to what that means but.

21            MR. NAMMAR:  Yeah.  And ultimately we defer to the

22   Court on where to end up.  I think Probation's recommendation

23   of 12 months and one day is a good one given the offense

24   conduct here.  I think that for me is the driving factor.

25            She was a knowing participant with Mr. Taboada.  She

1   assisted him in his drug trafficking behavior.  She drove him

2   to pick up drugs on multiple occasions from his suppliers, then

3   she assisted in the selling of distribution -- or quantities of

4   methamphetamine.  In addition to that, on at least one occasion

5   she's captured on a wiretap weighing out about 7 grams of

6   methamphetamine.

7          Not only that, she allowed Mr. Taboada to live in her

8   family house.  That's where her family here today lived.  I

9   think was her mom, maybe her grandma.  I think her brother as

10  well.  And it was a studio connected to the house, but he was

11  running a thriving drug business out of that space.

12         So, I think a sentence of 12 months and a day will

13  deter Ms. Zapata from taking part in conduct like this in the

14  future if she were to slip up and fall back into drug use.  I

15  hope she doesn't.  I don't think she will, but there's a

16  chance.  It will also deter others in the community from taking

17  part in similar behavior.

18         There's a lot of positive here.  She completed the

19  Kapilipono program, which is no easy feat.  She tested negative

20  38 times for methamphetamine.  She cooperated.  She has really

21  no criminal history.  She has a good job.  And she's got family

22  support.  I think the Court knows that a lot of people are in

23  this courtroom with nobody in the gallery.  So I think all

24  those things support a variance.  It's just a question of how

25  far to go.

1          THE COURT:  All right.  Thank you.

2          MR. NAMMAR:  I did want to note that there is

3    forfeiture mentioned in the information, but that was taken

4    care of administratively.  So there's no need for forfeiture to

5    be part of the sentence.

6          THE COURT:  Okay.  Thank you.

7          All right.  Well, what I must do of course is consider

8    the 3553(a) factors here.  We have no mandatory minimum, so we

9    don't have that facing us.

10          I'm not going to recite each of the factors for the

11    sake of doing so.  I'll talk about those that I think are

12    particularly relevant.  And I always just cite, you know, the

13    parsimony clause.  I think it's important to remember that the

14    Court imposes a sentence that is sufficient but not greater

15    than necessary to comply with the goals of sentencing.

16          And the goals of sentencing in shorthand are sort of

17    retribution, incapacitation, and deterrence, and then to the

18    extent a defendant needs certain medical-type needs.

19          Now, here when I look at the offense conduct, as

20    offenses go here in federal court, it's sort of on the low end

21    of offense conduct that we typically see.  I don't want to

22    minimize it, Ms. Zapata, by saying that.  You know, but clearly

23    the point I want to make is you weren't a pound dealer.  You

24    weren't even necessarily a consistent sort of, you know,

25    multi-ounce dealer.  I see you as somebody who lived with your

 1   boyfriend, you yourself had a meth problem and, you know, it's
 2   not too hard to see how you ended up where you ended up given
 3   the circumstances.
 4           You know, in particular it sounds like what I'm seeing
 5   is you were in some physically abusive relationships and then
 6   you found somebody who wasn't physically abusive.  And that was
 7   almost new to you.  And it resulted in you maybe thinking in a
 8   way you never should have thought about -- about the
 9   relationship and what he meant to you and what he was doing by
10   using you in relation to the drug trafficking.
11           But again, I don't want to overstate that.  It's not
12   as if you didn't have free will.  And I think that's part of
13   what you were saying.  You understand you had free will.  You
14   understood, you know, you made decisions.  There's some human
15   factors that I see that go into that decision-making of yours,
16   but ultimately it doesn't help anyone to ask them, you know,
17   what did I do wrong and start pointing somewhere else, right?
18   The place to point is right at yourself.
19           And I think that's part of what Kapilipono has taught
20   you.  That you have to look at these things and confront them
21   head on and understand what you did.  It's important to
22   understand why you did it, but that doesn't excuse the fact
23   that you did it.
24           So, you know, the offense conduct isn't overly serious
25   in relation to a lot of offenses I see here in federal court.

1    And, you know, that's reflected in part also by the fact you
2    got a two-level reduction for role in the offense.  You have no
3    prior convictions.  You know, there are a number of things here
4    that tell me that you have this family support, you've done
5    well for -- while on release even outside of the Kapilipono
6    program.  You're safety valve eligible.  I mean there's all
7    these things that sort of wrap up to tell me that if there was
8    no Kapilipono, if there was no 5K, to me this would be a below
9    guideline sentence.  Now, how far below, you know, that's a
10   discussion we would have if we were here with that.  You know,
11   would it be a 36, would it be a 30-month sentence.  I don't
12   know.  You know, I don't think I need to decide that today.
13   But it would be a below-sentence range in my viewpoint -- from
14   my viewpoint.
15          Then we have the cooperation.  And I've taken to be
16   very hesitant to talk in open court about specifics.  So I'm
17   not going to do it.  It's in the paperwork.  You talked about
18   it.  You talked about it.  Let me just say that it's -- from my
19   perspective it appears that she was fully -- tell me if I'm
20   wrong -- you know, fully honest with you.  This wasn't somebody
21   you had to debrief several times to get the truth.
22          MR. NAMMAR:  That's correct.
23          THE COURT:  And she was fully truthful, gave what she
24   could, maybe it wasn't as much as, you know, some people can
25   give who were more involved in the drug world.  But it was

1    useful and resulted in the motion, and that the aid to the

2    government in the manner set forth in the government's motion,

3    I will just leave that at that.

4            And then we have the Kapilipono program.  And, you

5    know, I was really glad when you got into the program.  It was

6    new.  And I think we're all still trying to figure our way

7    around that program somewhat.  But I think it was important

8    that we have this inaugural sort of class come out and see how

9    it worked.  And, you know, from everything that I heard and

10   read, you were an A student.  Not a perfect student, but none

11   of us are perfect students, right, because we're learning as we

12   go.  And that's what you did, I think, is you learned as you

13   went.

14           And I think you're a better person.  I think you're a

15   more mature person.  I think you have a sense of where you want

16   to be.  There are a lot of people that sit where you're sitting

17   right now that I hear, and I'm sure Mr. Nammar and Mr. Otake,

18   you'd agree with this, that they understand what they did in

19   the past was wrong and they're able to apologize for it,

20   they're able to accept responsibility, but they don't

21   necessarily have insight as to where they want to be in the

22   future, right?  It's sort of like I'm seeing today, I'm seeing

23   the past and I know that was wrong, but I don't know how to get

24   here.  I don't know how to move into the future.  I don't have

25   a plan, I don't have a good sense of how to take responsibility

1    for my own life moving forward.  And that's not uncommon.  And

2    I'm not being critical of those people, it's just where they

3    are.

4         And I always look for somebody who has a sense of what

5    that future is and what they need to do to succeed in that

6    future, and I think you've shown that.  I think you've shown

7    that.  And not just through your words.  It's -- words have

8    meaning and I get it and it's important, but it's also through

9    your actions, right?  And that's reflected in your success in

10   the Kapilipono program, starting off at the vet sort of as a,

11   I'm not sure what the word is, kennel, sort of, keeper, you

12   know, but wanting to be more.  And wanting to challenge

13   yourself in a way that you wouldn't have before.  And then when

14   there are issues at work, how do you address those with your

15   co-workers.  You know, how do you go about doing that and doing

16   it differently than maybe you did before.  And that's all

17   reflected in the paperwork.

18        So, you know, I think all of that is extremely

19   positive.  So, you know, we have in my view three different

20   buckets, sort of, that are at play here.  One is just the

21   offense conduct itself is serious, yes, but given your role and

22   how all of this played out, I likely would be below guideline.

23   I would be below guideline.  We have the 5K and then we have

24   just how well you've done.  And this is even well before

25   Kapilipono.  I mean you didn't test positive, as I recall,

1    before, right?  And you were out for quite a while before

2    Kapilipono, right?

3              THE DEFENDANT:  Mm-hmm.

4              THE COURT:  Right.  And I remember when Mr. Otake

5    wanted to get you in, he was sort of apologetic because he

6    realized he should have done that earlier.  You know, we were

7    right up to sentencing, as I recall.

8              MR. OTAKE:  That's right.  And that was my

9    unfamiliarity with the program.

10             THE COURT:  Right.  Right.  And I remember you saying

11   that, sort of like my bad, but don't take it out on my client.

12             MR. OTAKE:  Right.

13             THE COURT:  Right.  And so, you know, you've done

14   really well.

15             So it's hard here for me because I'm weighing these

16   factors and when I look at the goals of sentencing, as far as

17   incapacitation, meaning to make sure you don't go out and

18   commit other crimes, I'm not concerned about that.  You're not

19   going to go out and commit other crimes right now.  I believe

20   you'll stay sober.  And I don't say that very often to people.

21   I don't say that very often because I don't always have a high

22   level of confidence.  And I won't say that unless I have a high

23   level of confidence because I've seen too many people fail.

24             But I see a dedication, maybe.  I can see it, you

25   know, in your face and I can see it in what you've done, that

1   you want -- you badly want to succeed and leave that life in

2   the rear view mirror, right?  And as I said, going back to this

3   theme, and you can look forward.  You have a sense of where you

4   want to go going forward.

5          So, you know, but deterrence is also a factor and

6   deterrence isn't just about you, deterring you.  It's also

7   about general deterrence as a whole.  And retribution is about

8   sort of paying a debt to society for what you did.  The wrong

9   nature of what you did.  And, you know, I often say in these

10   sentencing hearings, and I never have a defendant disagree with

11   me, that methamphetamine is poison.  You know, it not only

12   poisons the body and it does terrible things to you physically,

13   but more metaphorically it's a poison to, you know, immediate

14   family, to extended family and to a community.  Because you are

15   very lucky to have, you know, mom and grandma and other family

16   members and your boyfriend here today because there are a lot

17   of sentencing hearings where there's nobody back there.  And

18   the reason there's nobody back there isn't necessarily they

19   don't care, it's they can't take it anymore.  That they just

20   can't take it.  They've been through years and years of this

21   meth-addicted person and the struggles and how that pulls

22   families apart and they just can't emotionally stand it

23   anymore.  And so these people are here with you and that's a

24   positive sign.

25          All of that said, I think some sentence is necessary,

1    Ms. Zapata.  I can't go outright to probation here given the
2    offense conduct.
3          Now, I'm going to vary way down.  I'm going to go
4    below what Probation recommended and what the government's
5    recommended, but I can't find my way to an outright sentence of
6    probation given everything here.
7          So taking into account all of these factors, if you'll
8    rise please I'll state my intended sentence, which is three
9    months of incarceration to be followed by three years of
10   supervised release.  No fine, I don't believe you have the
11   ability to pay a fine.  Restitution is not applicable.  Special
12   assessment of $100.
13         Mr. Otake, would you waive my reading of the standard
14   and mandatory conditions of supervision?
15         MR. OTAKE:  We will, Your Honor.
16         THE COURT:  All right.  So in addition to the standard
17   and mandatory conditions of supervision, when you get out of
18   custody, you must refrain from any unlawful use of a controlled
19   substance and submit to one drug test within 15 days of
20   commencement of supervision and at least two drug tests
21   thereafter, but no more than 15 valid drug tests per month.
22         You must cooperate in the collection of DNA.  You must
23   report to the probation office in the federal judicial district
24   where you are authorized to reside within 72 hours of the time
25   of your release, unless Probation instructs you to report to a

1    different office or within a different time frame.

2          You must participate in an outpatient substance abuse

3    treatment program and follow the rules and regulations of that

4    program.  The probation officer, in consultation with the

5    treatment provider, will supervise your participation, to

6    include provider, location, modality, duration and intensity.

7          As part of that, you must submit to substance abuse

8    testing to determine if you have used a prohibited substance.

9    You must not attempt to obstruct or tamper with testing

10   methods.

11         You must provide Probation access to any requested

12   financial information and authorize the release of that, which

13   may be shared with the U.S. Attorney's Office.

14         And last, you must submit your person, property,

15   house, residence, vehicle, papers or office to a search

16   conducted by Probation.  Failure to submit to a search may be

17   grounds for revocation.  And you must warn any occupant of your

18   premises regarding this condition.  Probation may conduct a

19   search only when reasonable suspicion exists that you have

20   violated a condition of supervision, and the areas or area to

21   be searched contains evidence of that violation.  Any search

22   must be conducted at a reasonable time and in a reasonable

23   manner.

24         All right.  Is there any legal objection to the

25   intended sentence as stated?

1               MR. NAMMAR:  No, Your Honor.

2               MR. OTAKE:  No, Your Honor.

3               THE COURT:  All right.  So the Court does impose

4     sentence as stated.

5               So would you like me to recommend FDC?  I think that's

6     what will happen anyways, Mr. Otake.

7               MR. OTAKE:  I think that's what will happen and --

8               THE COURT:  I'll just make that recommendation in any

9     event.

10              MR. OTAKE:  Thank you.

11              THE COURT:  All right.  And then, you know, I'm happy

12    to extend mittimus as I don't know what she's thinking or what

13    you're thinking, Mr. Otake.

14              MR. OTAKE:  That's what -- we'll definitely ask for an

15    opportunity to self-surrender.  Can I have a second?

16              THE COURT:  Sure.

17                   (Pause in the proceedings.)

18              THE COURT:  Sir, don't shake your head at me like

19    that.  If you're going to do that leave the courtroom.

20              UNIDENTIFIED MALE:  I will.

21              THE COURT:  Good.

22              UNIDENTIFIED MALE:  I don't know how you guys expect

23    her to get better.

24              THE COURT:  What did you say?

25              UNIDENTIFIED MALE:  I don't know how you expect her to

1   get better like this.

2           MR. OTAKE:  We apologize, Your Honor.  But we would

3   ask for six to eight weeks.

4           THE COURT:  That's fine.  I mean I want her to be able

5   to work with her workplace, see if there's any chance she can

6   get her job back.

7           MR. OTAKE:  Maybe eight weeks.

8           THE COURT:  Any way for her to put things in as good a

9   position as she can, I want that to be able to happen.

10          MR. OTAKE:  I think eight weeks might be the best way

11  to do that then.

12          THE COURT:  All right.

13          MR. OTAKE:  Thank you.

14          THE COURT:  So if we can get a date in a couple

15  months, Renee.

16          THE COURTROOM MANAGER:  June 9, 2022, by 2 p.m., Your

17  Honor.

18          THE COURT:  All right.  So, ma'am, you have to

19  self-surrender by 2 p.m. June 9th at the local time of the

20  institution you're designated.  Do you understand that?

21          THE DEFENDANT:  Yes.

22          THE COURT:  I don't make that decision, the Bureau of

23  Prisons does.  But if it's in the Mainland, I don't think it

24  will be, you would have to pay your own way there.  Do you

25  understand that?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Okay.  And do you promise me you will

3    self-surrender by 2 p.m. on June 9th to the institution

4    designated?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  You understand it's a separate criminal

7    offense if you don't do that?

8          THE DEFENDANT:  Mm-hmm.

9          THE COURT:  Yes.

10          THE DEFENDANT:  Yes.

11          THE COURT:  Okay.  All right.  I know you're not happy

12    with this.  I know you were hoping for something different,

13    ma'am, but understand I do have faith in you.  I think -- I

14    know you'll make it.  I really do believe that Kapilipono

15    program is really good for you.  But, you know, I -- I just

16    felt at the end of the day, when I considered all the 3553(a)

17    factors, including that, that this was the appropriate, just

18    sentence under all the circumstances.

19          All of what you've done doesn't wipe away everything

20    you did in the past.  That's something you just need to

21    understand.

22          All right.  Anything -- oh, plea agreement in this

23    case, right?

24          MR. NAMMAR:  The appellate waiver rights.

25          THE COURT:  All right.  You have entered into a plea

1   agreement in which you've waived most of your rights to appeal,

2   but if you believe the appeal waiver provision is not

3   enforceable or if you believe you can appeal a matter not

4   waived, then you must file a Notice of Appeal within 14 days of

5   entry of judgment.  Failure to do so acts as a waiver, meaning

6   you forever give up your right to appeal.  And Mr. Otake will

7   explain these rights to you in a little more detail if not

8   today very soon.  Do you understand all that?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  Anything further then?

11          MR. NAMMAR:  No, Your Honor.

12          MR. OTAKE:  No, Your Honor.

13          THE COURT:  All right.  Court is in recess.

14          (The proceedings concluded at 3:31 p.m.,

15   April 14, 2022.)

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing pages is a

6    complete, true, and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter and that

8    the transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10
           DATED at Honolulu, Hawaii, May 2, 2022.
11

12

13                        */s/ Cynthia Fazio*
                          CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25